John C. Coughenour, UNITED STATES DISTRICT JUDGE
This matter comes before the Court on Defendant's motion for summary judgment (Dkt. No. 20), Plaintiff's cross-motion for *1337 summary judgment (Dkt. No. 34), and Plaintiff's motion to supplement the administrative record (Dkt. No. 23). Having thoroughly considered the parties' briefing and the relevant record, the Court finds that oral argument is unnecessary and hereby DENIES Defendant's motion for summary judgment, GRANTS Plaintiff's cross-motion for summary judgment in part, and DENIES Plaintiff's motion to supplement the administrative record for the reasons explained herein.
I. BACKGROUND[1]
Plaintiff Lanette Hodge ("Hodge") last worked in January 2014 as a Licensed Practical Nurse ("LPN") for Intermountain Health Care ("Intermountain") in Idaho. (Dkt. No. 18-5 at 34.) Intermountain provided its employees with a disability insurance benefits plan ("the Plan") funded by a policy issued by Defendant Hartford Life and Accident Insurance Company ("Hartford"). (Dkt. No. 18-1 at 6.) In addition to funding the Plan, Hartford evaluated whether beneficiaries' qualified for long term disability benefits. (Id. at 20.)
1. Eligibility Under the Plan
The Plan defines two classifications of disability. Under the first classification, a beneficiary is disabled if she is unable to perform one or more of the essential duties of her own occupation-i.e. the occupation at the time of disability. (Id. at 21.) This "own occupation" period of disability generally lasts for 12 months after a beneficiary is approved for benefits. (Id. ) Under the second classification, a beneficiary is considered disabled if she is unable to perform one or more of the essential duties of "any occupation." (Id. )
The Plan defines "any occupation" as "any occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than the lesser of: 1) the product of Your Indexed Pre-disability Earnings and the Initial Benefit Period Percentage; or 2) the Maximum Monthly Benefit." (Id. ) To qualify for benefits, a claimant must provide proof of loss that is "satisfactory" to Hartford. (Id. at 18.)
2. Hodge's Pre-Disability Medical History
Hodge began working as an LPN in 1984. (Dkt. No. 18-2 at 38.) In 2011, she started to experience constant pain in her right hip. (Id. at 81.) Hodge attempted to treat the pain with steroid injections, physical therapy, and a right hip bursectomy, but none of the interventions worked. (Id. ) After an MRI revealed degenerative joint disease in 2012, Hodge underwent right total hip arthroplasty (hip replacement) surgery. (Dkt. No. 18-5 at 64.)
A year after surgery, Hodge conducted a follow-up with her orthopedist Dr. Christopher Peters ("Dr. Peters"). (Id. ) Hodge continued to complain of pain in her hip and Dr. Peters gave her a primary diagnosis of right hip osteoarthritis and dysplasia. (Id. at 46.) Dr. Peters also restricted Hodge from lifting more than 15 pounds at work. (Id. at 64.) In January 2014, Intermountain determined that it could not accommodate Hodge's functional restriction and she began a leave of absence from work. (Id. at 62, 65.)
In February 2014, Hodge was reexamined and complained of continued hip pain. (Dkt. No. 18-4 at 92.) Dr. Peters recommended that Hodge undergo a revision of her total hip arthroplasty. (Id. at 94.) Hodge subsequently underwent a hip aspiration procedure followed by revision surgery that made adjustments to her prosthetic hip. (Dkt. No. 18-2 at 64.) Following *1338 surgery, Dr. Peters ordered that Hodge not return to work until July 2014. (Dkt. No. 18-4 at 99.)
3. Hodge's Long Term Disability Claim
In June 2014, Hodge applied for long term disability benefits under the Plan. (Dkt. No. 18-4 at 23-27.) Hartford reviewed Hodge's medical records and determined that she qualified for long term disability benefits under the Plan's "own occupation" classification. (Dkt. No. 18-2 at 26-29.) Hodge was subsequently reevaluated multiple times by Dr. Peters, who gave a similar prognosis regarding her hip. (Dkt. No. 18-4 at 23-24, 74-75.) In October 2014, the Social Security Administration ("SSA") awarded Hodge disability benefits, with a qualifying disability date of January 14, 2014. (Id. at 67.)
In March 2015, Hartford began to investigate whether Hodge qualified for continuing disability benefits under the Plan's "any occupation" classification. (Dkt. No. 18-1 at 72-73.) Based on information it received from Dr. Peters, Hartford determined that Hodge could work in a sedentary occupation and was not eligible for disability benefits under the "any occupation" classification. (Dkt. No. 18-3 at 73-75.) Hodge appealed Hartford's denial and provided additional evidence regarding her disability. (Id. at 13-14.) Hodge's evidence included treatment information from Doctor Michael McEntire ("Dr. McEntire") who began treating Hodge for pain management after Hartford denied her disability claim. (Dkt. No. 18-3 at 13-18, 27-39.)
As part of the appeal, Hartford referred Hodge's file for an independent medical record review. (Dkt. No. 18-1 at 91.) Hartford instructed Doctor Behzad Emad ("Emad") to review Hodge's medical records, seek input from Dr. Peters and Dr. McEntire, and render an opinion on any restrictions or limitations affecting Hodge's functionality. (Id. ) Dr. Emad ultimately rendered an opinion that Hodge was able to perform full-time work with certain restrictions and limitations. (Dkt. No. 18-2 at 64-70.) Using Dr. Emad's report, a vocational case manager identified several occupations Hodge could perform. (Id. at 39.) Hartford concluded that Hodge did not qualify for the "any occupation" classification of long term disability and denied her appeal. (Dkt. No. 18-1 at 89-95.)
Hodge brings this suit pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. , challenging Hartford's denial of her claim for long term disability benefits. (Dkt. No. 6-1 at 2.)
II. DISCUSSION
ERISA allows a plan participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The parties have stipulated that ERISA governs this case, and that the Court should decide the case without a trial based on the administrative record and the parties' cross-motions for summary judgment. (Dkt. No. 16 at 2.)
A. ERISA Standard of Review
District courts review a plan administrator's denial of benefits "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch , 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In contrast, when a plan gives the administrator discretion to determine eligibility for benefits or to construe the terms of the plan, the Court reviews a denial of benefits for an abuse of discretion.
*1339 Montour v. Hartford Life & Acc. Ins. Co. , 588 F.3d 623, 629 (9th Cir. 2009). Whether an administrator abused its discretion is a question of law, not fact. Nolan v. Heald Coll. , 551 F.3d 1148, 1154 (9th Cir. 2009). For ERISA cases, a motion for summary judgment is "the conduit to bring [that] legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." Bendixen v. Standard Ins. Co. , 185 F.3d 939, 942 (9th Cir. 1999).
In this case, The Plan grants Hartford "full discretion an authority to determine eligibility for benefits and construe and interpret all terms and provisions of the Policy." (Dkt. No. 18-1 at 31, 33). Given that clear language, the Court will apply an abuse of discretion standard.[2]
B. Conflict of Interest
A conflict of interest exists in ERISA cases where the plan administrator both evaluates claims and pays benefits. Metro. Life Ins. Co. v. Glenn , 554 U.S. 105, 112, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). A district court should consider a so-called structural conflict of interest when determining whether a plan administrator abused its discretion. See Montour, 588 F.3d at 630. "[A] reviewing court should consider [the] conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and [ ] the significance of the factor will depend upon the circumstances of the particular case." Metro. Life Ins. Co., 554 U.S. at 108, 128 S.Ct. 2343.
In it undisputed that a structural conflict of interest exists in this case because Hartford evaluated Hodge's claim for disability benefits and was also responsible for paying the claim. (Dkt. No. 18-1 at 31, 33.) Hartford argues that its conflict of interest should be given little weight because it "administered Hodge's claim in a fair and objective manner." (Dkt. No. 22 at 15.) Hodge asserts that the conflict is substantial because Hartford "failed to adequately investigate [her] claim" and "failed to credit Plaintiff's reliable evidence." (Dkt. No. 28 at 7.)
The Court will consider this conflict, along with other relevant factors, as part of its analysis of whether Hartford's denial of Hodge's claim represented an abuse of discretion. As discussed in greater detail below, the Court gives moderate weight to the structural conflict of interest because Hartford failed to adequately investigate Hodge's disability claim.
C. Consideration of Materials Outside the Administrative Record
Hodge asks the Court to consider evidence outside the administrative record. (Dkt. No. 23.) When a district court reviews a denial of benefits under an abuse of discretion standard, its review should generally be limited to the administrative record. Pac. Shores Hosp. v. United Behavioral Health , 764 F.3d 1030, 1041 (9th Cir. 2014) (citation omitted). The administrative record is made up of the evidence considered by a plan administrator in reaching its claim determination. See Abatie v. Alta Health & Life Ins. Co. , 458 F.3d 955, 970 (9th Cir. 2006). There is an exception, however, that allows courts to consider extrinsic evidence if the plan administrator has a conflict of interest. Id. "The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest." Id.
Hodge wishes to supplement the administrative record with medical progress notes from January 2017. (Dkt. Nos. 32-1, 32-2.) Hodge asserts that the documents *1340 "will be helpful with respect to the issue of disability." (Dkt. No. 23 at 1.) Hartford objects to the Court's consideration of these documents because they are outside the administrative record and not relevant to its conflict of interest. (Dkt. No. 25 at 2-3.)
The Court will not consider these supplemental documents because they are minimally related to Hartford's structural conflict of interest. The progress notes detail pain and anxiety Hodge was experiencing in January 2017. (Dkt. Nos. 32-1, 32-2.) The Court notes that these medical issues appear largely unrelated to Hodge's hip condition, which was the basis for her disability claim. (Id. ) Moreover, the notes describe Hodge's condition 19 months after Hartford initially denied Hodge's disability claim and 11 months after its final benefit determination. (Dkt. No 18-1 at 90-94.) Hodge has not demonstrated how her medical condition in 2017 is relevant to Hartford's claim decisions in 2015 and 2016. Therefore Hodge's motion to supplement the administrative record (Dkt. No. 23) is DENIED.
D. Hartford's Denial of Hodge's Claim
The Court must determine whether Hartford abused its discretion when it determined that Hodge was not eligible for benefits under the Plan's "any occupation" classification. In reviewing for an abuse of discretion, a plan administrator's decision "will not be disturbed if reasonable." Conkright v. Frommert , 559 U.S. 506, 521, 130 S.Ct. 1640, 176 L.Ed.2d 469 (2010) (internal quotation marks and citation omitted). In determining the reasonableness of the administrator's decision, a court should consider "all the circumstances before it," rather than considering factors which support the administrator's decision "in isolation." Pac. Shores Hosp. , 764 F.3d at 1042. Relevant factors "include the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts 'with all of the relevant evidence[,]' and whether the administrator considered a contrary SSA disability determination, if any." Montour , 588 F.3d at 630 (citation omitted). To find an abuse of discretion, the Court must have a "definite and firm conviction that a mistake has been committed and [ ] may not merely substitute [its] view for that of the fact finder." Salomaa v. Honda Long Term Disability Plan , 642 F.3d 666, 676 (9th Cir. 2011) (citation omitted).
Hartford asserts that it is entitled to summary judgment because it "applied a reasoned and principled process in its evaluation of Hodge's LTD claim, and reasonably based its claim and appeal determinations on substantial evidence in the administrative record." (Dkt. No. 22 at 16.) Hodge, in contrast, argues that Hartford failed to adequately investigate her claim when it relied on conflicting reports from Dr. Peters and ignored her consistent reports of pain. (Dkt. No. 28 at 7.) The Court will analyze Hartford's denial of benefits using the factors noted above.
1. The Quality and Quantity of Medical Evidence
When Hartford approved Hodge for disability benefits under the "own occupation" classification, it relied primarily on the restrictions and limitations ordered by Dr. Peters. (Dkt. No. 18-1 at 66.) In June 2014, Dr. Peters limited Hodge to walk, stand, or sit for no more than 30 minutes at a time and for no more than one hour per day. (Dkt. No. 18-5 at 21.) His opinion relied heavily on Hodge's complaints of pain because x-rays revealed that her hip revision had healed and showed no complications.
*1341 (Id. at 8, 13.) Hodge reported a pain level of 9/10, had moderate swelling of the hip with tenderness on palpation, and complained of pain during range of motion exercises. (Id. at 8.)
Hartford determined that Dr. Peters' restrictions and limitations were supported because the typical recovery time for a total hip replacement is six months to a year depending on the physical demands of a patient's occupation.[3] (Dkt. No. 18-1 at 66.) Hartford noted that Hodge "has positive exam findings of limited ROM and moderate swelling to the surgical site." (Id. ) Hartford did not question Dr. Peters' restrictions and limitations despite x-rays showing "no evidence of subsidence, loosening, osteolysis, wear, or other problems" with Hodge's revision. (See Dkt. No. 18-5 at 2, 8.) Nor did Hartford question Hodge's subjective pain complaints.
Hodge's follow-up examinations produced similar recommendations from Dr. Peters. In September 2014, Dr. Peters reported no changes to his previous physical examination findings. (Dkt. No. 18-4 at 74.) He restricted Hodge to walking and standing for no more than two hours at a time and for no more than two hours total per day. (Id. at 75.) Dr. Peters gave no opinion as to Hodge's ability to sit. (Id. ) In February 2015, Hodge reported a pain level of 8/10, her hip was tender on palpation, and she demonstrated range of motion limitations similar to before. (Dkt. No. 18-4 at 23-24, 37.) Dr. Peters noted that physical therapy "only made her worse" and opined that Hodge "has exhausted all efforts in improving her hip pain and we have exhausted all efforts here with us ... [with] continued time, she may improve, but this is seeming like chronic pain now." (Id. at 23-24.) As before, x-rays showed no complications with the revision. (Id. at 37.)
Dr. Peters completed an attending physician's statement that limited Hodge to walk, stand, or sit for no more than one hour at a time and for no more than two hours per day. (Dkt. No. 18-4 at 38.) He opined that the expected duration of Hodge's restrictions and limitations was unknown but "greater than a year." (Id. ) In almost all respects, the basis for Dr. Peters' restrictions and limitations-the results of his physical examination and Hodge's subjective complaints of pain-were the same as in June 2014. (Compare Dkt. Nos. 18-4 at 22-23, with 18-5 at 20-21.) The restrictions and limitations for standing, walking, and sitting were also nearly identical. (Compare Dkt. Nos. 18-4 at 38, with Dkt. No. 18-5 at 21.)
In March 2015, Hartford reviewed Dr. Peters' latest report and determined that there was "no objective evidence to support [Hodge's] significant report of pain or limitations provided." (Dkt. No. 18-1 at 71.) Hartford sent a one-page letter to Dr. Peters that sought "to clarify [Hodge's] function for seated activities on a full time basis with the option to change positions for comfort." (Id. ) Hartford faxed Dr. Peters a one-page letter that posed three questions:
1) Are your restrictions based on Ms. Hodge's report of pain and her report of inability to perform her job duties? Yes___ No___. If "No," what is the basis for the limitations in sitting, standing, and walking?
2) Based on the medical evidence, in an 8-hour day, would you agree that she would be capable of sitting up to an hour at a time for up to 6 hours in a day with a position change as needed for comfort? Yes___ No___. If "No," what evidence prevents this activity?
*1342 3) Have you prescribed, or is she using an assistive device (cane, walker, etc)? Yes___ No___.
(Dkt. No. 18-4, at 16.) Dr. Peters returned the document marking "yes" to each question and writing "on occasion" below the third question. (Id. ) Other than these responses, Hartford did not communicate with Dr. Peters about Hodge's disability. Hartford submitted Dr. Peter's updated restrictions and limitations to a vocational case manager, who relied on the information to determine four sedentary occupations Hodge could perform. (Dkt. No. 18-3 at 80-81.) Based on that report, Hartford determined that Hodge did not qualify for the "any occupation" classification of disability. (Id. at 73-75.)
The Court notes several issues with Hartford's request for and use of Dr. Peters' updated opinion regarding Hodge's functional capacity. First, in stating that there was "no objective evidence to support" Hodge's "significant report of pain," Hartford failed to credit Hodge's reliable evidence regarding her disability. Plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan v. Nord , 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Courts in the Ninth Circuit have repeatedly held that "pain is an inherently subjective condition." See, e.g. , Salomaa , 642 F.3d at 678 ; Saffon v. Wells Fargo & Co. Long Term Disability Plan , 522 F.3d 863, 871 (9th Cir. 2008). A plan administrator cannot require a claimant to provide objective evidence to prove a subjective condition such as chronic pain, or implicitly reject subjective evidence when making a disability determination. See James v. AT & T W. Disability Benefits Program , 41 F.Supp.3d 849, 879-80 (N.D. Cal. 2014). Hartford appeared to implicitly reject Hodge's complaints of pain when it questioned Dr. Peters' report, despite his findings being consistent with prior physical examinations and with Hodge's reports of pain.
Second, Dr. Peters' updated functional restrictions regarding Hodge's ability to sit were in direct conflict with his prior restrictions. (Compare Dkt. No. 18-4 at 38, with Dkt. No. 18-4, at 16.) After examining Hodge in February 2015, Dr. Peters opined that she could not sit down for more than an hour at a time and for no more than two hours in one day. (Dkt. No. 18-4 at 38.) Those restrictions were consistent with his previous recommendations. (Dkt. No. 18-5 at 21.) Less than two months later, and without reexamining Hodge, Dr. Peters concluded that she could sit for up to six hours a day in an eight-hour workday. (Id. at 16.) Moreover, Dr. Peters' response to Hartford's letter provided no explanation for why his restrictions and limitations had completely changed.
Dr. Peters' recommendation also appears contrary to his subsequent examination of Hodge. In May 2015, Hodge presented with almost all of the same symptoms as she had since undergoing her hip revision in 2014. She reported a pain level of 8/10, was using a cane to walk, reported that physical therapy was exacerbating her pain, had a limited range of motion in her right hip, and tenderness on palpation. (Dkt. No. 18-3.) Dr. Peters further noted that "without known etiology of her pain we would like to rule out rare causes of pain at this point." (Id. ) He recommended Hodge undergo a number of tests, the results of which do not appear in the administrative record.
Hartford continued to rely on the restrictions and limitations suggested by Dr. Peters, despite his earlier conflicting recommendations, and no apparent change in Hodge's physical condition. Almost all of the medical evidence that led Hartford to *1343 conclude Hodge was disabled under the "own occupation" classification was present when it subsequently reached the opposite conclusion regarding the "any occupation" classification. Moreover, Dr. Peters' original restrictions and limitations had nothing to do with Hodge's job duties as an LPN, but were based on a "general workplace environment." (Dkt. No. 18-4 at 39.)
While the Court concludes that it was reasonable for Hartford to consider and give weight to Dr. Peters' opinion regarding Hodge's sitting restriction, it was not reasonable for his conflicting opinion to be the only medical evidence considered by the vocational case manager and Hartford to conclude Hodge did not meet the "any occupation" classification. (Dkt. No. 18-3 at 80.) An administrator can abuse its discretion when it "fails to develop facts necessary to its determination." Pac. Shores Hosp. , 764 F.3d at 1042 (quoting Anderson v. Suburban Teamsters of N. Illinois Pension Fund Bd. of Trustees , 588 F.3d 641, 649 (9th Cir. 2009) ). Faced with Dr. Peters' conflicting opinions and some documented uncertainty regarding Hodge's condition, Hartford chose not to conduct any additional investigation. The quantity and quality of the medical evidence available to Hartford weighs in favor of finding that it abused its discretion.
2. Hartford's Paper Review of Hodge's Claim
Hartford never conducted an independent medical examination of Hodge and instead based its entire evaluation on her medical records. A plan administrator is not required to examine the claimant. Kushner v. Lehigh Cement Co. , 572 F.Supp.2d 1182, 1192 (C.D. Cal. 2008) ("ERISA also does not require that an insurer seek independent medical examinations."). However, where a plan administrator merely conducts a paper review of a beneficiary's claim, especially where a conflict of interest exists, the Court can weigh that fact to determine whether there was an abuse of discretion. Salomaa , 642 F.3d at 669. "Though the lack of an in-person examination is not determinative, it is a relevant consideration, especially with respect to conditions that are not susceptible to objective verification." Lavino v. Metro. Life Ins. Co. , No. 08-CV-2910, slip op. at 12, 2010 WL 234817 (C.D. Cal. Jan. 13, 2010).
Hartford's failure to conduct an independent examination of Hodge is notable for several reasons. First, Hartford received conflicting information from Dr. Peters regarding Hodge's functional impairment. See supra Sec. D. 1. Hartford had an opportunity to conduct an independent examination of Hodge when it received Dr. Peters' conclusion that Hodge could not sit for more than an hour at a time. But instead of ordering an independent examination, it sent Dr. Peters a letter that asked him if he would alter his opinion. After Hartford received the second opinion from Dr. Peters, which contradicted his first opinion, it again failed to order an independent examination of Hodge. An independent examination would have also been appropriate based on Dr. Peters' recommendation that Hodge should seek a second opinion and that Hodge was dealing with "chronic pain" for which he had "exhausted all efforts." (Dkt. No. 18-4 at 16, 23-24.)
Second, after Hodge appealed her initial claim denial, Hartford chose not to conduct an independent medical examination and instead relied on an independent record review. (Dkt. No. 18-1 at 54.) Hartford noted that "[a]lthough the claim was terminated based on the opinion of Dr. Christopher Peters, additional medical information for a different provider was submitted on appeal. As an independent medical examination at this time would not [ ] offer *1344 insight into the claimant's condition when benefits were terminate[d], will refer for independent physician review." (Id. ) The Court disagrees with Hartford's conclusion that an independent examination would not have offered insight into Hodge's disability determination.
An independent examination would have provided Hartford with a medical opinion that could have reconciled the conflicting restrictions recommended by Dr. Peters. That seems especially appropriate given the conclusions provided to Hartford by Dr. McEntire after Hodge had been denied disability benefits. Dr. McEntire began seeing Hodge in July 2015, where she presented with the same complaints of pain and physical limitations she described to Dr. Peters. (Dkt. No. 18-2 at 81-83.) Dr. McEntire noted that "I do not feel I have a good curative option for her pain, especially since she has been through extensive physical therapy and prior surgeries. This is likely a long-term condition without good options for repair." (Id. at 95.) Hodge's physical condition and complaints of pain never varied from the time she began seeing Dr. Peters to when she was treated by Dr. McEntire. (Compare Dkt No. 18-4 at 23-24, with Dkt. No. 18-2 at 81-83.) Yet Hartford relied on Dr. Peters' conflicting reports rather than seek a second opinion.
Finally, Dr. Emad did not examine Hodge or speak with her treating physicians. Although Hartford did not instruct Dr. Emad to conduct a physical examination of Hodge, it did instruct him to get the input of Dr. Peters and Dr. McEntire about her disability. (Dkt. No. 18-1 at 54.) Dr. Emad attempted to call each doctor but never spoke with either of them (Id. ) While a plan administrator is not required to base its decision solely on the opinions of a claimant's treating physicians, "courts routinely weigh such records more heavily than they do reports and file reviews from paid consultants who never examine the claimant or talk to the claimant's treating physicians." Eisner v. The Prudential Ins. Co. of Am. , 10 F.Supp.3d 1104, 1115 (N.D. Cal. 2014) (citing Salomaa , 642 F.3d at 676 ). Dr. Emad's failure to get the input of either treating physicians makes his ultimate opinion regarding Hodge's functional impairment less convincing because it relied completely on her medical records. The lack of an independent medical examination weighs toward finding an abuse of discretion.
3. Consideration of Hodge's Social Security Award
Hartford did not adequately account for Hodge's Social Security disability determination during its evaluation of her long term disability claim. The Ninth Circuit has made clear:
While ERISA plan administrators are not bound by the SSA's determination, complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was the product of a principled and deliberative reasoning process. In fact, not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence.
Montour , 588 F.3d at 635. Properly acknowledging a conflicting Social Security award requires more than simply comparing the differing standards of each claim, but entails comparing the medical evidence upon which the decision makers relied. See Salz v. Standard Ins. Co. , 380 Fed.Appx. 723, 724 (9th Cir. 2010) ("A proper administrative process will meaningfully discuss a claimant's award of Social Security benefits ... [and] analyz[e] the distinctions between the basis for the two awards").
Hartford paid lip service to Hodge's SSA determination in its denial of her *1345 disability benefits. Hartford was aware that around the same time it was evaluating Hodge's long term disability claim, SSA had deemed her disabled. (Dkt. No. 18-4 at 67.) In its denial letter, Hartford acknowledged that Hodge was receiving Social Security disability benefits but noted "[t]he standards governing these public and private benefits are different in critical ways." (Dkt. No. 18-3 at 73.) It went on to write that "while the Hartford considers the SSA's determination as one piece of relevant evidence, the SSA's determination is not conclusive." (Id. ) The record belies Hartford's assertion that it considered the SSA's determination in its decision.
Other than the conclusory language in its denial letter, there is no evidence in the record that shows Hartford considered how or why SSA reached its decision. The claims analyst who initially evaluated Hodge's claim did not mention anything about how SSA's disability determination was substantively different than Hartford's determination. (See generally Dkt. No. 18-1 at 52-88.)[4] Hartford did not provide Dr. Emad with the SSA award letter, nor did his report even mention that Hodge had received an SSA disability determination. (Dkt. No. 18-2 at 64-70.) Indeed, other than Hodge's Social Security award letter, the record does not include the documents that support SSA's disability determination. This omission is particularly glaring given that SSA's determination was made contemporaneous to Hodge's application for long term disability with Hartford. In other words, the SSA would have been considering the same medical evidence that was before Hartford in determining whether Hodge was disabled.
Hartford's failure to consider Hodge's Social Security disability determination weighs in favor of finding an abuse of discretion.
4. Hartford's Structural Conflict of Interest
When considering the entire record, the Court gives moderate weight to the structural conflict of interest in this case because there is evidence that Hartford failed to adequately investigate Hodge's disability claim. A court may weigh a structural conflict more heavily if there is evidence that the administrator "fails adequately to investigate a claim or ask the plaintiff for necessary evidence ...." Abatie , 458 F.3d at 968. In assessing the effect of a conflict of interest, the court must view evidence of bias in the light most favorable to the claimant. Stephan v. Unum Life Ins. Co. , 697 F.3d 917, 930 (9th Cir. 2012).
As the Court has previously discussed, Hartford failed to adequately investigate Hodge's disability claim under the "any occupation" classification. Hartford sought an updated opinion from Dr. Peters regarding Hodge's functional capacity because it believed there was "no objective evidence to support [Hodge's] significant report of pain or limitations provided." (Dkt. No. 18-1 at 71.) Hartford did that even though it had previously credited Dr. Peters' restrictions and limitations on Hodge that were based on the same physical symptoms and subjective complaints of pain. (Compare Dkt. Nos. 18-4 at 22-23, with 18-5 at 20-21.) Rather than conduct an independent medical examination of Hodge, Hartford sent Dr. Peters three leading questions and asked him to simply check "yes" or "no." (Dkt. No. 18-4, at 16.) Hartford did not conduct any type of meaningfully dialogue with Dr. Peters about his recommendations or have him *1346 explain why his assessment of Hodge's functional capacity could change so drastically without any change to Hodge's physical condition. Hartford simply sent Dr. Peters the conclusion it wanted him to reach. Hartford's inquiry, in light of its structural conflict of interest, appears purely ends-driven.
Hartford's failure to conduct an independent medical examination of Hodge also highlights it conflict of interest. Faced with apparent conflicting reports from Dr. Peters, Hartford chose not to obtain a second opinion or have Hodge evaluated. Under the Plan's terms, Hartford could have ordered Hodge to undergo an independent evaluation prior to its initial denial or during the appeal process. (Dkt. No. 18-1 at 17.) Yet Hartford chose not to seek additional medical information. Hartford's conflict of interest is also magnified by its failure to meaningfully consider the SSA's disability determination. Hartford neither distinguished the SSA's decision nor provided Dr. Emad with the information to consider during his record review.
Finally, Hartford allowed Dr. Emad to reach his opinion without having talked with either of Hodge's treating physicians. That decision was directly contrary to Hartford's instruction that Dr. Emad seek the input of Dr. Peters and Dr. McEntire. Indeed, at just about every turn, Hartford developed the minimum amount of information needed to make its disability determination. Given all the circumstances, the Court finds that Hartford's conflict of interest improperly motivated its decision to terminate Hodge's long term disability benefits.
Weighing all of the aforementioned factors, the Court has a "firm and definite conviction" that Hartford's denial of Hodge's claim was unreasonable. Salomaa , 642 F.3d at 678. Based on the entire record, the Court finds that Hartford abused its discretion in denying Hodge's disability claim under the Plan's "any occupation" classification.
E. Hodge's Remedy
As relief, Hodge seeks either the reinstatement of her long term disability benefits, retroactive to July 14, 2015, which is the day after her benefits were terminated or a lump-sum payment of benefits reflecting her lifetime entitlement under the Plan. (Dkt. No. 28 at 8.) Where plan benefits are unjustifiably terminated, the Court may order the reinstatement of those benefits. Pannebecker v. Liberty Life Assur. Co. of Boston , 542 F.3d 1213, 1221 (9th Cir. 2008) (holding the district court erred in failing to retroactively reinstate long-term disability benefits wrongfully terminated by the defendant); Grosz-Salomon v. Paul Revere Life Ins. Co. , 237 F.3d 1154, 1164 (9th Cir. 2001) (affirming district court's award of benefits and denial of request to remand where disability insurer abused its discretion by terminating benefits). In the present case, the Court has determined that Hartford abused its discretion when it terminated Hodge's long term disability benefits without conducting an adequate investigation.
Accordingly, Hartford shall reinstate Hodge's long term disability benefits in accordance with this order and the terms of the Plan until such time as the administrator properly terminates said benefits according to the Plan's provisions. See Pannebecker , 542 F.3d at 1221 (ERISA benefits may be reinstated if the claimant would have continued receiving benefits absent the administrator's wrongful conduct). Hartford shall pay Hodge back benefits equal to the amount she would have received had Hartford not improperly terminated her benefits on July 14, 2015. The Court will not grant Plaintiff's request for a lump sum payment equal to Hodge's lifetime benefit under the Plan, as Hartford *1347 could determine in the future that Hodge is no longer eligible for benefits. This order does not preclude Hartford from determining that Hodge does not meet the Plan's "any occupation" classification in the future.
III. CONCLUSION
For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 20) is DENIED, Plaintiff's cross-motion for Summary Judgment (Dkt. No. 34) is GRANTED in part, and Plaintiff's motion to supplement the record is DENIED. In accordance with this decision, the Court FINDS and ORDERS the following:
1. Defendant abused its discretion when it denied Plaintiff's claim for long term disability benefits under the Plan's "any occupation" classification in July 2015.
2. Plaintiff is entitled to long term disability benefits under the Plan from July 14, 2015, to the present, without prejudice to Defendant's future exercise of its rights under the Plan.
3. Plaintiff is a prevailing ERISA plaintiff and, therefore, is entitled to attorney fees. United Steelworkers of Am. v. Ret. Income Plan for Hourly-Rated Emps. of ASARCO, Inc. , 512 F.3d 555, 564 (9th Cir. 2008). The Court will award reasonable attorney fees in an amount to be determined according to proof made by motion pursuant to Rule 54 of the Federal Rules of Civil Procedure and filed no later than 14 days after the Court enters judgment.
5. Plaintiff is entitled to prejudgment interest. Blankenship v. Liberty Life Assurance Co. , 486 F.3d 620, 627 (9th Cir. 2007).
6. The parties are ORDERED to meet and confer to determine the amount of disability benefits and prejudgment interest owed to Hodge. Plaintiff shall submit a proposed judgment no later than January 30, 2018.

The facts in this section are drawn from the administrative record filed by Defendant and, unless otherwise stated, are undisputed by the parties.

Plaintiff does not challenge the abuse of discretion standard. (Dkt. No. 28 at 2.)

This recovery time is likely overstated as Hodge underwent a revision of her prosthetic hip in 2014, not a total hip replacement.

Indeed, it appears from the record that what Hartford discussed with Hodge about her Social Security award was that it would reduce her long term disability benefits under the Plan. (Dkt. No. 18-1 at 78-80.)